# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 13-10307-WGY |
| ) | |
| ) | |
| REGINALD ROSCOE ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

On December 9, 2015, United States Probation issued its preliminary Presentence Report ("PSR") in this matter. Probation correctly concluded that the Defendant is a Career Offender as a result of four prior predicates of either a crime of violence or a drug trafficking offense. PSR at ¶¶ 42 (drug trafficking), 43 (drug trafficking), 44 (drug trafficking), and 48 (unarmed robbery). Based on that, Probation calculated the Defendant's advisory guideline range based on a Total Offense Level of 29, a CHC of VI (22 criminal history points) and an advisory guideline range of 151-188 months. PSR at ¶ 118.

Notwithstanding this advisory guideline range, the government is asking that this Court sentence the defendant to 96 months in prison to be followed by eight years of supervised release with the special conditions noted below. This recommended sentence is based on the small amount of the drugs involved in the case, the sentence given to the co-defendant (who had a dramatically different criminal history but was the supplier of the drugs here), and on Roscoe's age and longstanding battles with mental health and substance abuse.

### A. Crime and Addiction in Our Neighborhoods

The government did not bring this case against Reginald Roscoe because of the small amount of drugs sold here. In fact, the case was prosecuted in spite of it. Roscoe was prosecuted

here because he has a horrific criminal record, because residents and families in the Lenox Street Housing Development should not have to step around drug deals while going in and out of their home, and because the defendant has been unable to break his longstanding drug use, meaning that absent some real change, the future for this defendant is likely to be his past happening over and over again to the detriment of himself, the victims to whom he sells drugs, the families of those victims, and the neighborhoods in which these people live.

People who suffer from serious substance abuse and or mental health issues deserve our sympathy and our support—provided was can simultaneously protect public safety. But the support that this defendant has gotten over the years simply has not produced any real results in curbing his offending. The PSR indicates that the defendant reportedly participated in drug treatment and mental health counseling while incarcerated and while out on the street. See PSR at ¶¶104-08 (mental health) and ¶¶ 109-12 (substance abuse) . Unfortunately for us all, these programs have failed to curb the defendant's use and distribution of drugs or affected his chronic offending (which includes *18 convictions in 12 cases since the age of 30)*. Indeed, the PSR shows that Roscoe has committed new crimes shortly after almost every release despite efforts made for over a decade to help the defendant deal with his drug and other problems.

Thus, there are always going to be sentencings in which criminal history issues simply must predominate even in the face serious drug problems. Where the defendant's criminal record is long, his recidivism persistent, and the potential for future crime of enough concern that public safety simply has to drive the sentence. See 18 U.S.C. § 3553(a)(2)(c). See also United States v. Finnigan, 2007 WL 4201167 (D. Kan. 2007)("In this case, the defendant's substantial criminal history, which spans nearly thirty years, shows that he needs a controlled custodial environment,

both for his own benefit and for the safety of society"). And where a significant sentence has to be imposed even though the offenses of conviction are a street sale of crack cocaine. See also United States v. Jones,762 F.Supp.2d 270, 281 (D. Mass. 2010) (Young, J.) ("There is nothing conceptually wrong with the career offender guideline. Incarceration is a blunt tool at best. First-time non-violent offenders ought receive the benefit of every rehabilitative program a court can devise. Thirty-three years of judicial experience, however, convinces me that higher sentences for repeat offenders are both appropriate and necessary. Regrettably, some offenders 'simply don't get it.'").

This is such a case. By the time the defendant was arrested in 2013 for aiding and abetting a street-level sale of crack cocaine in the Lenox Housing Development, he was a 23-year veteran of the criminal justice system. See Presentence Report at ¶41 (defendant first conviction was for illegal breaking and entering at age 25). Since his first arrest on November 11, 1992, the defendant has remained under criminal justice supervision for over 23 years on a nearly continuous basis during which time he has been convicted of 35 crimes in 23 cases, been incarcerated 23 times for periods up to five years, and repeatedly violated probation .[1] Moreover, the defendant's record includes multiple crimes of violence or weapons charges. PSR at ¶ 34

---

1   The defendant's crimes shows that he is exactly what Congress had in mind when it directed the Sentencing Commission to promulgate a career offender guideline that "shall assure that the guidelines specify a sentence at or near the maximum term authorized." See 28 U.S.C. §994(h). See also United States v. Torres, 541 F.3d 48, 51 (1st Cir. 2008) (affirming 195-month sentence where sentencing judge referred to 27 year-old defendant who had sold 10.1 grams of crack after sustaining earlier convictions for drug distribution, burglary, and gun possession   as a "classic career offender [of the type] Congress had in mind for these long prison sentences"); United States v. Jackson, 30 F.3d 199 (1st Cir. 1994)(after reviewing the words Congress chose in promulgating 28 U.S.C. § 994(h) in career offender case, the First Circuit noted that, "we are also mindful that the courts' role 'is as interpreters of the words chosen by Congress, not as policymakers or enlargers of congressional intent.'") (citations omitted).

(ABDW, ABPO); 35(A&B), 36 (ABDW), 37 (ABPO), 42 (Carrying Dangerous Weapon); 43 (Assault Dangerous Weapon); 47 (Larceny from the Person) 50 (Unarmed Robbery and A&B);52 (ABPO, Resisting Arrest); 53 (Resisting Arrest); 54 (ABPO). These offenses show that the defendant is not the "non-violent drug dealer" that so many recent criminal justice reforms have been directed at helping.

Yet, despite all this, there Roscoe was, on September 4, 2013, while on state court pretrial release on 2 cases, peddling crack cocaine with Jaleel Burton in Lenox Street, one of our city's most troubled public housing developments. [2]  PSR at ¶¶10-23 (Offense Conduct);   59 and 60, (cases open as of the time of the charged offense). In view of all the circumstances present here, the government asks the Court to incarcerate the defendant for 96 months, *a sentence more than 35% below the low end of the advisory guideline range of 151-188.*

B.  **The damage drug trafficking causes to individuals and communities**

Street level drug trafficking has many victims. While it obviously affects the direct users of the drugs, the resulting misery goes much deeper. Spouses, significant others, children, relatives, friends, employers and communities as a whole all feel the sting of crack cocaine,

---

2  Other aspects of the defendant's criminal record that only compound its seriousness.   For example, Probation has correctly concluded that the defendant has 22 criminal history points, well in excess of the 13 required for entry into CHC VI. PSR at ¶ 56.   And those calculations do not reflect additional cases (that would carry close to another 12 points) that are too old to count in Roscoe's current criminal history calculations. PSR at ¶¶ 33, 34, 35, 36, 37, 38, 42, and 43). Although the government is seeking a sentence substantially *below* the applicable guideline range here, other courts faced with similar records have not hesitated to *upwardly depart*. E.g., United States v. Mellerson, 145 F.3d 1255, 1257 (11th Cir.1998) (per curiam ) (affirming three-level upward departure where the defendant's criminal history points tripled the number necessary for a Criminal History VI); United States v. Johnson, 648 F.3d 940 (8th Cir. 2011)(affirming upward departure based on remote convictions too old to be included in criminal history calculations); United States v. Dawson, 494 Fed.Appx. 624 (7th Cir. 2012)("Nonserious and outdated convictions may serve as the basis for an upward departure when they are evidence of a "lifelong pattern of criminality.")(internal quotations and citation omitted).

heroin, and the other illegal drugs in their midst day after day. Both in the effects the drugs have on individual users and the impact that drug dealing (and the violence it has been shown to breed) has on the quality of life on entire communities in ways outsiders may find difficult to appreciate.

As prosecutors, it is difficult to find spokespersons for the damage that crack and heroin dealing does. It is usually impossible to locate specific victims, much less induce them to speak. So we are forced to look to what community leaders and academics tell us about living in neighborhoods almost in the shadow of this Courthouse.

One voice that has been heard about the effect of all this on our communities is the Rev. Eugene Rivers, former head of the Ten-Point Coalition and the current director of the Ella J. Baker House. Shortly after the infamous quadruple murder in Mattapan in 2010 (which was ultimately tied back to drug trafficking), Rev. Rivers was interviewed on WBUR about the mood of the communities in which the murders occurred. The government offers his comments, not to criticize anyone involved in the criminal justice system, but because they poignantly express the outrage many in that neighborhood felt:

> The Clergy have to be clear that, if you do the crime, you have to do the time. We no longer rationalize or make excuses for over- the-top, out of control, unacceptable behavior. The Black Church must take the hard line that, if you do the crime, kid, you should go to jail. The Black Churches have to challenge the judges to stop coddling criminals and then putting them back on the streets to wreak havoc in the Black Community. That is absolutely correct.[3]

Reverend Rivers is not the first inner-city resident to recognize the havoc that a small minority involved with drugs and drug-related violence can have on entire communities-- communities visible only in times of tragedy but who live with the reality of street dealers every day. See

---

3  A copy of the CD containing these remarks will be available at sentencing.

also Donald Braman, "Criminal Law and the Pursuit of Equality," 84 Tex. L. Rev. 2097, 2098 (2006)("Despite the Constitution's guarantee to equal protection, it is fair to say that today most black Americans feel neither equal under nor protected by our criminal laws. The effects of under enforcement are devastating: Many people living in our nation's inner cities no longer feel safe walking through their own neighborhoods."); article also discussed the results of a 1996 study that showed that a majority of Black Americans "are afraid to walk alone at night near their own home"); Tracey L. Meares & Dan M. Kahan, "When Rights Are Wrong," in Urgent Times: Policing and Rights in Inner-City Communities 3, 4 and 15 (Joshua Cohen & Joel Rogers eds., 1999) (describing how the building search policy of the Chicago Housing Authority was declared unconstitutional over the objections of the community residents whose constitutional rights were supposedly being protected and noting that "instead of shunning the police, inner-city residents are demanding that police give them the protection they have historically been denied.").

More recently, a judicial voice has also been added to the conversation about the seriousness of drug offenses and what they do to communities:

> The drug crimes prosecuted in the federal courts are always violent, and I mean that literally. When you distribute a substance that you know is poison to another person that is a violent act. Period. End of story. Moreover, the connection between guns and drugs is beyond dispute. Not every purveyor of drugs uses or carries a gun, but the world where they operate organizes around one thing and one thing only, guns.   Still further, whole neighborhoods that were once rich, vibrant and nurturing are now literal war zones because of drugs. In large swaths of America, functional families are no more because of drugs. Like global warming, these are inconvenient truths.

> To be sure, addiction and poverty drive many offenders and those factors often substantially lessen (or should substantially lessen) a federal offender's culpability. And, I certainly agree that statutory mandatory minimum sentences make little sense and have resulted in federal prison sentences that are far, far longer than are wise or just. In that same vein, I strongly support those who want to lessen the number of people we put in federal prisons.

But, I am also a legal realist. To say that federal drug crimes are "non-violent" is bullshit–plain and simple.

The Honorable Richard G. Kopf, District Judge District of Nebraska (September 8, 2013) available at "Hercules and the Umpire. The Role of the Federal Trial Judge" [http://herculesandtheumpire.com/2013/09/08/no-more-bullshit-in-the-federal-courts-there-is-no-such-thing-as-a-non-violent-drug-crime/](http://herculesandtheumpire.com/2013/09/08/no-more-bullshit-in-the-federal-courts-there-is-no-such-thing-as-a-non-violent-drug-crime/).

Notwithstanding all these observations, the simple fact is that there is still a disconnect in many drug sentencings. Some courts in this district has made it clear that they are troubled by the drug guidelines and do not consider street-level trafficking to be a serious crime. E.g., United States v. Haynes, 557 F. Supp. 2d 200 (D. Mass. 2008). These concerns have been expressed irrespective of either drug weight (which has been described as "an unsatisfying and empty stand-in for the concerns underlying our current sentencing regime") or the frequency with which illegal drug sales are made. Id. See also United States v. Garrison, 560 F. Supp. 2d 83, (D. Mass. 2008)(stating that sentencing calculations in drug cases "more often reflected the happenstance of when the police happened to be on a given corner or for how long the police surveilled them"). Thus, advisory guidelines are ignored despite the damage drugs cause and the established correlation between drug trafficking and the violence it so often breeds. See generally United States Sentencing Commission, "Cocaine and Federal Sentencing Policy," (May, 2007) at 86 ("According to [Professor Alfred] Blumstein, the [40% reduction in national violence since 1993] is attributable to a reduction in new users of crack cocaine and a consequent reduction in the crack cocaine street markets."); Johnson, "Patterns of Drug Distribution: Implications and Issues," 38 Substance Use and Misuse 1795 (2003) cited by the Sentencing Commission for the proposition

7

that "almost all crack cocaine related violence of the 'systemic' type, that is violence that occurs within the drug distribution process.").

### C. Mitigating Factors

The seriousness of the defendant's criminal history and his crime of selling crack cocaine in one of Boston's beleaguered public housing developments does not of course end the inquiry. Because there is always more than one side to every sentencing "story." And because the sentence the Court imposes must reflect careful consideration of them all. See United States v. Rodriguez, 527 F.3d 221, 228 (1st Cir.2008) ( recognizing that post-Booker sentencings require a "holistic review of the full panoply of section 3553(a) factors"). While the government cannot predict all of the arguments defense counsel will raise in seeking a sentence undoubtedly below the 96 months the government is recommending, there are certain mitigators that the Court should consider in determining how much it will vary from the 210-month low end of the guideline range. See generally United States v. Martin, 520 F.3d 87, 91 (1st Cir. 2008)("Of course, the fact that a sentencing court possesses the raw power to deviate from the guidelines does not mean that it can (or should) do so casually. The court's reasons for deviation should typically be rooted either in the nature and circumstances of the offense or the characteristics of the offender; must add up to a plausible rationale; *and must justify a variance of the magnitude in question*. See, e.g., United States v. Scherrer, 444 F.3d 91, 93 (1st Cir.2006) (en banc); Jiménez-Beltre, 440 F.3d at 519. *Moreover, a certain "sliding scale" effect lurks in the penumbra of modern federal sentencing law; the guidelines are the starting point for the fashioning of an individualized sentence, so a major deviation from them must "be supported by a more significant justification than a minor one."* Gall, 128 S. Ct. at 597.)(emphasis supplied).

### 1. Longstanding Substance Abuse/Mental Health Issues

The government does not question that the defendant has a longstanding substance abuse problem and mental health issues that have undoubtedly contributed his crimes and criminal history. See PSR at ¶¶ 109-112 The government also agrees that the fact of addiction makes a defendant less culpable when compared to, for example, a dealer who peddles drugs only for profit. E.g., United States v. Garcia, 497 F.3d 964, 972 (9th Cir. 2007)("[D]istrict courts are not prohibited in all circumstances from considering a defendant's drug addiction in choosing a reasonable sentence"); United States v. Hairston, 502 F.3d 378 (6th Cir. 2007) (affirming substantial variance from guideline range where defendant sold crack cocaine to support his own dependence).

But the issue here is just not a simple as saying the defendant is an addict and that a substantial variance is therefore warranted. First, that issue cannot explain away a criminal record as extensive and serious as the one before the Court. More importantly, however, the fact of addiction is correctly viewed as a mitigating factor only if there is a real basis to believe that the sentence of this Court will somehow produce a different result than all of his prior convictions by prompting the defendant to beat his longstanding drug problem. Because if it doesn't, any early release in this case will fail to adequately protect public safety and simply lead to more crime if the defendant reverts to his prior use and sale of dangerous drugs, thereby endangering his community and himself and wounding his customers even further. See PSR at ¶ 101 (defendant's medical history includes scars from fights, stabbing, and gunshot). See also U.S.S.G. § 5H1.4 ("Drug or alcohol dependence ordinarily is not a reason for a downward departure. Substance abuse is highly correlated to an increased propensity to commit crime").[4]

---

4 Assessing the significance of mental health from a sentencing perspective is similarly nuanced.

The unfortunate fact is that the record before the Court cannot provide any assurance that, even with the benefit of BOP's 500 Hour Drug Treatment Program (which the government asks the Court to recommend), and all the services and resources at Probation's disposal, the defendant will beat his addiction this time once he is released. As already discussed, the defendant has already been through numerous drug treatment programs but has been unable to beat a his drug habit. While the government would like to hope that the past is not the best predictor of the defendant's future, the Court cannot turn a blind eye to the profound difficulties he has experienced in beating drugs and the implications of relapse not just on Mr. Roscoe, but to the safety of the community into which he will be released. While the defendant's addiction surely warrant making every treatment option available to the defendant while he is in prison and when he goes on supervised release, the extent to which it should influence the sentence for a defendant with such a serious criminal history is much less clear.

2. **Age**

Age is another potential mitigating factor in this case. Social science tell us that the rate of offending slows for most defendants as they approach the age of thirty. Here, by contrast, the defendant did not commit his first crime until he was 25 and has been convicted of 16 crimes

---

While mental health issues may also make a defendant appear less culpable they may also make him more likely to recidivate. See Cullen v. Pinholster, 131 S.Ct. 1388, 1410 (2011) (evidence about mental illness and substance abuse is not "clearly mitigating" because a jury may conclude that the defendant "was simply beyond rehabilitation," suggesting further that such evidence can be a "two-edged sword") (internal quotes and citation omitted); Brewer v. Quarterman, 550 U.S. 286, 293 (2007) (mitigating evidence that included evidence that the defendant had depression and abused drugs "tended to confirm the State's evidence of future dangerousness as well as lessen his culpability for the crime."). See also United States v. Wimberly, 2009 WL 2462371, *3 (10th Cir. 2009) (affirming denial of variance where mental health issues made it more likely that defendant would recidivate). Like addiction, therefore, mental issues should play an important role in the defendant's rehabilitation while incarcerated and in the special conditions while he is on supervised release but may not be major determinants in determining the length of the actual sentence.

(in 12 cases) since reaching the age of 30.  See PSR at ¶¶ 44-55 (crimes committed after age 29).  Because of all this (and the two open cases that remain pending against him), Roscoe's age does not seem to mitigate for a lower sentence.  Id. at ¶¶ 59 and 60.

## PROPOSED JUDICIAL RECOMMENDATIONS

The government is requesting that the Court make several recommendations to the Bureau of Prisons that can get the defendant moving in the right direction for his ultimate release.  They include: (i) that he be given any available mental health counseling including any available anger management programs; (ii) that he be given any available education or vocational training (so that the defendant may have some marketable job skills when he is released); and (iii) that he be given any substance abuse counseling that is available to him from the Bureau of Prisons (including but not limited to the 500 hour drug treatment program).

## SUPERVISED RELEASE ISSUES

Regardless of the sentence that this Court imposes, the defendant should be given access to all appropriate services that this Court and United States Probation can provide him after he is released.  The government is also requesting that Roscoe be given 8 years of supervised release so that he may receive any and all appropriate services and will remain under the supervision of the Court in the event that he reverts to what is so clearly a lifetime of crime and drug use.  While he is on supervised release, the two most critical issues will be drug/mental health treatment and housing.  The defendant should be ordered to comply with any mental health or drug treatment/ drug testing ordered by Probation (up to a maximum of 104 tests per year).  He should also be required to reside in a Residential Reentry Center such as the Coolidge House until he is able to secure a residence that is acceptable to Probation so he doesn't end up homeless again.

The defendant should also be subject to a 9p.m.-7 a.m. curfew for the first nine months of

his supervised release once a suitable residence *outside a halfway house* is located.  See, e.g., "Maximum Impact: Targeting Supervision on Higher-Risk People, Places and Times," Pew Center for the States Public Policy Brief (March, 2009)(concluding that Probationers are "at the highest risk of re-arrest during the first few months on community supervision," that arrest rates after 15 months were substantially lower, and thus recommending that probation resources be "front-end loaded" to achieve maximum effect).   The government also suggests that the defendant's probation officer should be allowed to relax the curfew for treatment, work or any vocational training. Consideration should be given to requiring that the defendant participate in Probation's MRT Program and he be recommended to participate in the CARE Program.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:  /s/ John A. Wortmann, Jr.
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney
One Courthouse Way
Boston, MA
(617) 748-3207

**CERTIFICATE OF SERVICE**

The government hereby certifies that the foregoing was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

/S John A. Wortmann, Jr.   12/17/15
JOHN A. WORTMANN, JR.
Assistant U.S. Attorney